### 52119. TAYLOR v. AETNA LIFE INSURANCE COMPANY et al.

MARSHALL, Judge.

The sole issue presented in this appeal is whether, under the evidence submitted, the trial court erred in determining as a matter of law that the decedent committed suicide.

The appellee, Aetna Life Insurance Company, issued a group life insurance policy through the decedent's employer insuring decedent's life for $30,000 in whole life benefits and $15,000 in accidental benefits. Decedent died from a gunshot wound in the abdomen on April 21, 1974. A dispute arose between the decedent's brother, the named beneficiary of the policy, and the decedent's estranged widow and child, the latter asserting an implied trust on the whole life benefits of the policy. The dispute was eventually resolved in favor of the brother. See *Taylor v. Aetna Life Ins. Co.,* 235 Ga. 630 (221 SE2d 45).

In the present action, decedent's brother seeks to recover the $15,000 accidental benefits under the policy. Aetna refused payment on the ground that decedent died from "intentional self-destruction or intentional self-inflicted injury" exclusions provided in the policy. Aetna moved for summary judgment on this ground, and it was granted.

The facts surrounding decedent's death, as shown from the depositions and affidavits of witnesses, are as follows. Decedent woke up on the morning of April 21, and went to church. Afterwards he picked up his girl friend and went to his brother's house for dinner. He spent the rest of the afternoon there with his brother, girl friend, mother, sister, his child and some other children. While there he was observed engaging in conversation in a normal manner and smiling and laughing. Around 5 o'clock he took his girl friend home and then went to his own apartment, accompanied by his 6-year-old son. He and his son played in the yard with a neighbor's dog. The neighbor came over and visited decedent in his apartment a short while and observed him to be normal. Between 5:30 and 6:00, decedent's girl friend came to his apartment. It was around this time each Sunday that decedent had to return the boy to his wife. The girl friend observed that decedent was sad because he had to return the child, but that it was usual for him to become depressed because of this event.

Decedent's wife, from whom decedent had been separated for six months, stated that when decedent brought the boy home an argument developed. During the course of the argument, decedent pulled her hair. Because the argument took place in the presence of the child, the latter became upset and the wife demanded the decedent leave. Decedent returned to his apartment. His girl friend was there, watching television and she observed him come into the apartment. He said nothing to her but went straight to the bedroom. After about an hour she heard the phone ring. Decedent answered it. Two or three minutes later she heard a loud bang. When she went into the bedroom she saw decedent lying on the bed. The phone was off the hook.

The caller had been decedent's wife, who had called to tell decedent that their argument had upset the child and he should not do it in the future. "Q. What did he [decedent] say? A. Well, he paused for a moment and then he said, 'Well, you don't have to worry about it because I am not going to be in your life any more anyway.' Q. Then what happened? A. Then there was a pause and I called out his name and he didn't answer and then the next thing

that I heard was an exclamation from him, 'Oh, my God.' I waited and waited and Susan — [decedent's girl friend] . . . picked up the phone and I asked where Skip was and I understood her to say that 'He has been shot' and I frankly did not believe it." She then hung up the phone. Decedent's girl friend summoned help and decedent was taken to the hospital where he died shortly thereafter. A pistol was found on the floor beside the bed.

There was no evidence of a note or any other writing left by decedent. Decedent's brother and girl friend both described him as appearing normal and coherent during that day. His depression from having to take the child back was not unusual. Decedent had been seeing a psychiatrist since July of 1970 for treatment of what the psychiatrist called a schizoid personality, a personality disorder, but that decedent was not overtly psychotic or incompetent. Decedent's wife stated that decedent once told her that the reason he was seeing a psychiatrist was so that he "wouldn't kill himself and me both."

There was no evidence of alcoholic consumption by decedent. There was evidence that decedent liked guns and often "fiddled with them." His brother had seen him "nervously handling" the pistol in question a few days previously. The autopsy showed "faint blackish deposits at the abdominal skin lining" at the bullet entry point. The death certificate showed the cause of death as "gunshot wound—abdomen," and that the injury occurred as a result of a "self-inflicted gunshot wound." Decedent was 28 years old. *Held:*

In the two most recent cases on this subject the Supreme Court reversed this court's conclusion that suicide was shown as a matter of law by the facts in both cases. In *Belch v. Gulf Life Ins. Co.*, 219 Ga. 823 (136 SE2d 351), the decedent insured was alone in a car when two gun shots were heard. He was found slumped over in the car, a bullet shot in the chest with the pistol in the seat beside him. There was also a note in the front seat which said "All my life I have tried to pay my debts. God bless you all. George. P. S. No setting up at J. C.'s." The Supreme Court held that the directing of a judgment n.o.v. for the insurance company was error.

In *Power v. Liberty Nat. Life Ins. Co.*, 221 Ga. 305

(144 SE2d 389), the deceased insured held a pistol to his head and told his girl friend he was going to shoot himself if she did not agree to marry him. She did not and he did. The Supreme Court found an issue for the jury. See also *Cox v. Independent Life &c. Ins. Co.*, 101 Ga. App. 211 (113 SE2d 228); *Metropolitan Life Ins. Co. v. Brock*, 87 Ga. App. 919 (75 SE2d 663); *Hall v. Progressive Life Ins. Co.*, 61 Ga. App. 792 (7 SE2d 606); *Pruitt v. Progressive Life Ins. Co.*, 55 Ga. App. 483 (190 SE 435).

In view of the above authorities, we are constrained to reverse the trial court's grant of summary judgment. As was stated in *Lincoln &c. Life Ins. Co. v. Parker*, 137 Ga. App. 699, "we are not prepared to demonstrate that the result here should be any different from that reached by the Supreme Court in *Power*, supra."

*Judgment reversed. Pannell, P. J., and McMurray, J., concur.*

ARGUED MAY 4, 1976 — DECIDED JUNE 1, 1976.

*Barnes & Browning, Roy E. Barnes,* for appellant.
*Carter, Ansley, Smith & McLendon, Tommy T. Holland, Flemister, Beasley, Baird & Slotin, Walter v. Beasley,* for appellees.